UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| INTELICLEAR, LLC,<br>    *Plaintiff*,<br>      *v.*<br>ROBERT J. VICTOR,<br>    *Defendant.* | Civil No. 3:16cv1403 (JBA)<br><br>October 3, 2016 |

**RULING GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

On August 17, 2016, Plaintiff InteliClear filed this action against Defendant Robert J. Victor ("Victor") alleging breach of fiduciary duty (Count One); civil theft in violation of CONN. GEN. STAT. § 52-564 (Count Two); conversion (Count Three); and demanding an accounting of all financial transactions regarding InteliClear assets and funds performed by Victor or at his direction (Count Four). On September 1, 2016 Plaintiff filed an amended complaint adding a claim for tortious interference with business expectancies (Count Five); and seeking a declaratory judgment that Defendant has been properly dissociated as an InteliClear member, that Member Martin Barretto ("Barretto") has replaced him as General Manager and Tax Matters Member and that Victor may not continue to act on InteliClear's behalf (Count Six).

That same day, Plaintiff filed a Motion [Doc. # 11] for an *Ex Parte* Temporary Restraining Order and Preliminary Injunction[1] directing Victor to: (1) deliver all InteliClear assets, funds, books, records and property to InteliClear's principal office and (2) authorize Union Savings Bank and Wells Fargo to transfer all InteliClear funds at their banks to a bank account in the name of

---

[1] The Court declined to issue an *Ex Parte* Temporary Restraining Order and instead scheduled a hearing on the motion for Preliminary Injunction, which was heard on September 12 and 13, 2016.

InteliClear as designated by Barretto, the new General Manager. (Pl.'s Mem. Supp. Mot. for Preliminary Injunction [Doc. # 11-4] at 16–17.) Additionally, Plaintiff asks the Court to enjoin Victor and all others acting in concert with him from: "(1) holding himself out as a member, General Manager, and Tax Matters Member of InteliClear; (2) continuing to act on InteliClear's behalf; (3) filing any tax returns or amended returns on InteliClear's behalf; and (4) interfering with InteliClear's continuing business and customer relations, opportunities, and expectancies." (*Id.* at 17.)

Defendant opposes Plaintiff's motion, arguing that the Court lacks jurisdiction (incomplete diversity) to hear the case because Victor has not been effectively dissociated from InteliClear and thus Plaintiff LLC still shares his citizenship. As explained below, the evidence and arguments presented at the two-day injunction hearing are sufficient for the Court to conclude it has subject matter jurisdiction and that Plaintiff's motion for a preliminary injunction should be granted in part.

## I.   Background

On February 20, 2004 Victor filed the Articles of Organization of Stockbridge Systems, LLC (whose name was later changed to InteliClear) with the Connecticut Secretary of the State. (Transcript I at 59-60.) Just under a year later, on January 1, 2005, Victor, Guy T. Powell ("Powell"), Antonio Martinho Barretto, and John Paul DeVito ("DeVito") entered into an Operating Agreement (the "Operating Agreement") (Pl.'s Ex. 2), a Members Agreement (the "Members Agreement) (Pl.'s Ex. 1), and a Members Confidentiality and Non-Compete Agreement (the "Non-Compete Agreement") (Pl.'s Ex. 3) setting out the terms of membership in InteliClear and the manner of its operation. (Transcript I at 25-26.) Victor, Powell and each had a 30% interest in InteliClear and DeVito had a 10% interest. (*Id.* at 169.) Victor was appointed General Manager

with authorization to manage the day-to-day operations of InteliClear. (*Id.* at 28; Pl.'s Ex. 2, § 6.2(a).) He was also appointed the Tax Matters Member. (Pl.'s Ex. 2, § 7.4.)

However, the relationship between Victor and the other three Members began to sour, resulting in litigation in both state and federal courts. In September 2015, Victor brought an injunctive action against Powell, Barretto, Brandon Consulting Associates, Inc. (a company controlled by Barretto), and InteliClear (as a nominal defendant who Victor later agreed to drop from the action) in Connecticut superior court seeking to enjoin Powell and Barretto, among other things, from improperly taking control of InteliClear's bank accounts after they attempted to close InteliClear's bank account in Connecticut and open a new one in New Jersey, over which Powell and Barretto would have sole control. (Def.'s Mem. Opp'n to Pl.'s Mot. for Preliminary Injunction [Doc. # 18] at 4-6; Pl.'s Ex. 9 at 7, 21.) Prior to filing his lawsuit, Victor had retained attorney Ann Rubin of Carmody & Torrance, LLP ("Carmody") to represent InteliClear (Transcript I at 84), and she and her colleague had "repeatedly advised Powell and Barretto that their actions violated their duties to InteliClear as well as the terms of InteliClear's operating agreement."[2] (Def.'s Mem. Opp'n to Pl.'s Mot. for Preliminary Injunction at 4; *see also* Def.'s Exs C, D, E.) In the context of Victor's state court action, mediation sessions were held and the parties reached an agreement on how InteliClear would continue to function pending the resolution of the suit. (Def.'s Mem. Opp'n to Pl.'s Mot. for Preliminary Injunction at 7; Def.'s Exs. A, B.)

Thereafter, the defendants removed Victor's action to federal court claiming diversity jurisdiction, and Powell and Barretto moved to dismiss, contending that these were not Victor's

---

[2] Barretto and Powell dispute Victor's authority to retain Carmody on behalf of InteliClear. (Transcript I at 90-92, 180.)

3

individual claims but were based upon alleged injury to InteliClear. (Def.'s Mem. Opp'n to Pl.'s Mot. for Preliminary Injunction at 7-8.) In response, Victor voluntarily dismissed his action because bringing InteliClear into the action would defeat diversity jurisdiction (*id.* at 8-9), and advised the court and opposing counsel that he intended to re-file these claims on behalf of InteliClear in state court as derivative claims, which would provide a single forum to resolve all the competing claims and counterclaims. (*Id.* at 10.) The federal district court dismissed the action without prejudice on August 15, 2016. *Victor v. Powell et al.,* 16-cv-817-VLB, Doc. # 29 (D. Conn). Baretto, Powell and Divito then deemed the prior mediation agreement to have expired. (Transcript II at 415-16.)

The next day, Barretto, Powell, and DeVito passed a "Unanimous Written Consent of the Members of InteliClear, LLC" (the "Consent"), which removed Victor as General Manager. (Pl.'s Exs. 21, 22.) On August 17, they passed a series of accompanying resolutions which, among other things, purported to change the company's address and to authorize closing InteliClear's existing bank account and opening a new one, with all payments received by InteliClear to be directed to the new account. (Pl.'s Ex. 10.) That same day, counsel for Barretto and Powell, who also represented InteliClear, filed the instant action. Complaint [Doc. # 1], *InteliClear v. Victor,* No. 3:16-CV-1403 (JBA) (D. Conn. August 17, 2016). On August 18, Barretto, Powell, and DeVito sent Victor a letter by email communicating the steps they had taken to dissociate him[3] and directing him to cease acting on InteliClear's behalf and to return all InteliClear property to InteliClear's New Jersey office. (Pl.'s Ex. 4.)

---

[3] See footnotes 7 and 8 *infra.*

As grounds for their actions, Barretto, Powell, and DeVito alleged that throughout Victor's tenure as General Manager of InteliClear he had breached the Operating Agreement and the Members Agreement in a multitude of ways, as articulated in the Consent, including issuing checks in excess of $5,000 without the written approval of a majority of the membership interest in violation of Section 6.1(b)(viii) of the Operating Agreement,[4] taking distributions without approval of a super majority of the membership interest and not in proportion to his ownership interest in InteliClear in violation of Section 5.1 of the Operating Agreement,[5] and repeatedly paying with InteliClear funds his personal expenses not claimed as business expenses and without advance approval by InteliClear, in violation of Paragraph 4 of the Members Agreement.[6] (Pl.'s Ex 21 at 1.)

As provided in their letter to Victor, Barretto, Powell and DeVito treated Victor's breaches as a "default . . . in the performance of [his] covenants, obligations, responsibilities, duties or undertakings set forth and provided for under the provisions of" the Agreements, and elected, pursuant to Paragraph 12,[7] to treat the default as a withdrawal by Victor as a Member of InteliClear,

---

[4] "Checks and withdrawals by the Company in amounts over $5,000.00 shall require the written approval of a Majority in Interest." (Pl.'s Ex 2 ¶ 6.1(b)(viii).)

[5] "Distributions from the operations of the Company shall be made, at such times and in such amounts as the Members may determine, by a Super Majority in Interest in proportion to each Member's Percentage Interest." (Pl.'s Ex 2 ¶ 5.1.)

[6] "Each Member shall be authorized to incur and the Company shall reimburse such Member for or directly pay on behalf of such Member all reasonable and necessary business, educational and professional expenses approved in advance by the Company and incurred by a Member in connection with the rendering of Member's Services to the Company." (Pl.'s Ex 1 ¶ 4(A)(1).)

[7] Paragraph 12, titled "Default and Governing Law," reads as follows:

and to treat the withdrawal as an Event of Dissociation under Paragraph 8.B of the Members Agreement, and Section 9.1(b)(4)(C) of the Operating Agreement.[8] (Pl.'s Ex. 4.)

    The three remaining Members decided to continue the business of InteliClear in accordance with Section 9.2(b) of the Operating Agreement,[9] and elected Barratto as the new General Manager. (*Id.* at 2.)  Thus, Plaintiff contends that as of August 16, 2016 Victor was

---

    "The default by any Member in the performance of any Member's covenants, obligations, responsibilities, duties or undertakings set forth and provided for under the provisions of the Operating Agreement, this Members Agreement, the Members Confidentiality and Non-Compete Agreement or any amendment or successor thereto, in which event, in addition to any remedy in law or at equity available to the non-defaulting Members, the non-defaulting Members may elect to treat such default as a withdrawal of the defaulting Member in connection with such Member's desire to no longer provide Member's Services to the Company under paragraph 8.B of this Members Agreement and may proceed with the elections provided non-withdrawing Members in paragraphs 8.B(1) and (2) above in regard the defaulting ember's [(sic)] Interest."

    Paragraph 8.B of the Members Agreement states "[i]n the event such withdrawal is in connection with such Member's desire to no longer provide Member's Services to the Company, the other Members shall have the right to . . . elect to treat such withdrawal as an Event of Dissociation under Section 10.7 of the Operating Agreement."

    In turn, Section 10.7 of the Operating Agreement reads "[t]he withdrawal, resignation or retirement from the Company by any Member, except as otherwise provided for herein, shall be an Event of Dissociation by such Member governed by the provisions of Article IX of this Agreement."

    [8] Section 9.1(b)(4)(C) provides that an "Event of Dissociation" includes "the voluntary withdrawal, resignation or retirement from the Company by a Member without the express written consent of a Super Majority in Interest."

    [9] 9.2(b) of the Operating Agreement states "[i]f at least two (2) Members of the Company have not been dissociated and a Super Majority in Interest of the non-dissociated Members consent in writing to continue the business of the Company within ninety (90) days following the occurrence of any such event set forth in . . . 9.2(a)(3)[, the occurrence of an Event of Dissociation as set forth in Section 9.1] then the business of the Company shall be continued by all of the non-dissociated Members…"

effectively dissociated from InteliClear and is no longer its Member, General Manager, or Tax Matters Member. (Compl. ¶ 30.) However, Victor vehemently disputes that he has been effectively dissociated from InteliClear and continues to hold himself out as a member and General Manager of InteliClear.[10] InteliClear's Union Savings Bank account was frozen by the bank pending resolution over Victor's authority to act on InteliClear's behalf.[11] (Transcript I at 201.)

Victor claims that "Guy T. Powell and Antonio M. Barretto caused InteliClear to bring this action to further their personal interests in taking away defendant Robert J. Victor's membership interest in InteliClear, which is likely worth at least several million dollars"[12] (Def.'s Mem. Opp'n to Pl.'s Mot. Preliminary Injunction [Doc. # 18] at 1), and that Powell and Barretto were "staging a coup to take over InteliClear":

> The present claim for injunctive relief thus has been completely manufactured by Powell and Baretto's actions in violation of their agreements, by which they have

---

[10] Victor testified that after receiving notice of his dissociation, he continued to perform his normal duties. (Transcript I at 33-34.) He also sent emails to InteliClear clients in which he stated that the changes they were informed of regarding where they should send payments and as to the organization of InteliClear were not "authorized by me as the Managing Member of InteliClear." (Pl.'s Ex. 8.) Most recently, Victor emailed to an InteliClear client a Statement, purporting to originate from InteliClear, with his Florida address listed in the heading under "InteliClear LLC." (Pl.'s Second Supplemental. Mem. Supp. Mot. for Preliminary Injunction [Doc. # 30] at 1-2.) Listing his "home address under InteliClear's name implies that Defendant was directing [the client] to remit payment to that address as if it were InteliClear's office address." (*Id.* at 2.)

[11] The Union Savings account has a total of around $280,000 in it. (Transcript I at 201.) InteliClear also has a Wells Fargo account containing about $10,000, which is not currently frozen. (*Id.* at 201-02.)

[12] The remaining Members, on the other hand, contend that Victor has misappropriated from InteliClear nearly $1,500,000 through 2014 with an adverse impact on InteliClear of over $1,700,000. (Pl.'s Mem. Supp. Mot. for Preliminary Injunction at 16.) This number is based off of the InteliClear books and records produced by Defendant in the state court action. (Transcript I at 150.)

> sought once again to take control of InteliClear's banking and customer
> relationships, with the result that InteliClear's bank accounts and its practical ability
> to function both have been frozen.

(*Id.* 7-8.). Victor asserts that "Powell and Barretto took their most drastic action, purporting to remove Victor as a member of InteliClear shortly after Victor presented a draft term sheet and memorandum of understanding describing a new transaction that is potentially worth more than ten million dollars to InteliClear." (*Id.* at 13.)

Five months earlier, in March 2016, Victor sold his home in Goshen, Connecticut, which had been InteliClear's principal office,[13] and in June he moved to Tampa Bay, Florida (Transcript I at 13-15), moving all of InteliClear's business records, furniture, and equipment from the Connecticut Office with him (*Id.* at 19) unbeknownst to Barretto, Powell, and DeVito until Victor's testimony at the hearing. (Transcript II at 267.)

The day after the email about his dissociation was sent to him, on August 19, Victor wrote several checks drawn on InteliClear's bank account at Union Savings in Connecticut.[14] (Transcript I at 46; Pl.'s Ex. 5.) Two of the checks, in the sums of $5,000 and $95,000 were made out to InteliClear and deposited in Sun Trust checking and savings accounts opened by Victor in Tampa Bay, Florida. (Transcript I at 43.) A third check for $30,000 with a notation "September draw," was made out to Victor individually and deposited into his personal Wells Fargo account, also located

---

[13] Currently the only active office for Plaintiff is in New Jersey, although there remains dispute regarding on what date the move was legally effective based upon a semantic difference which Defendant draws between 'principal office' and 'office' that seems meaningless under current circumstances since there is no longer any office in Goshen, Connecticut as originally provided for.

[14] Although the checks are dated August 17, 2016, Victor testified that he recalls writing the checks on the 19th.

in Tampa. (*Id.* at 43-45.) Plaintiff claims these actions were an effort by Defendant to "sweep" InteliClear's bank account. (Pl.'s Mem. Supp. Mot. for Preliminary Injunction at 8.)

## II.   Discussion[15]

### A.   Subject Matter Jurisdiction[16]

---

[15] The Court applies federal law for all procedural questions, but Connecticut law (which the Members Agreement designates as the applicable state law) for the substantive issues. *See Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer,* 380 U.S. 460, 465 (1965)) ("It is a long-recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law.'").

[16] The Court asked that both parties provide supplemental briefing regarding the application of the second paragraph of Paragraph 12 of the Members Agreement, which states that

> [a]ny controversy or claim arising out of the Members Agreement . . . shall be governed by and enforced under the laws of the State of Connecticut and shall be brought exclusively in any court of competent jurisdiction sitting either in the County of Litchfield or the County of Hartford in the State of Connecticut. . . . In the event the Company's principal office is subsequently located to a state other than Connecticut, then all provisions of this paragraph relating to the state of Connecticut . . . shall be deleted and replaced by the state in which such principal office of the Company is located at the time any such controversy or claim arising out of or relating to this Members Agreement arose.

Since at least some of the conduct which gave rise to the immediate "controversy or claim" occurred while the principal office was undisputedly in Connecticut, venue is proper in Connecticut pursuant to the contract. Additionally, the parties have each consented to venue in the current forum. Because "the right to attack venue is personal to the parties and waivable at will, a district judge should not, in the absence of extraordinary circumstances, impose his choice of forum upon the parties by deciding on his own motion that there was a lack of proper venue." *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369, 371 (2d Cir. 1966); *see also Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir. 1999); *Chavis v. A-1 Limousine,* 101 F.3d 686 (2d Cir. 1996). Consequently, the Court will not transfer the case to New Jersey, nor will it dismiss the case for improper venue.

A federal court must ascertain as early as possible whether it has subject matter jurisdiction over a plaintiff's claims, including a request for a preliminary injunction. Defendant vehemently disputes the asserted diversity jurisdiction because he contends he remains a member of the Plaintiff LLC, which by law takes the citizenship of each of its Members, and thus InteliClear cannot be diverse from him. *See Roll-A-Cover, LLC v. Cohen,* No. 3:09-CV-1378 CSH, 2010 WL 5146435, at *2 (D. Conn. Dec. 13, 2010) ("the citizenship of a limited liability company is determined by the citizenship . . . of each of its members.") (citing *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC,* 692 F.3d 42, 49 (2d Cir.2012)). On the other hand, if Plaintiff is correct that Defendant has been properly dissociated, the Court has jurisdiction under 28 U.S.C. § 1332 because Defendant and InteliClear would be citizens of different states, leaving complete diversity intact.[17] It is clear, therefore, that the Court's jurisdictional determination cannot be separated from Plaintiff's claim that Defendant, as a dissociated Member, must be enjoined from continuing to act as a Member of InteliClear in ways that are harming it.

Defendant argues that the Court may not "assume" jurisdiction for purposes of deciding the merits. Here, however, the Court is not "decid[ing] the merits, under the guise of determining jurisdiction, without the ordinary incidents of a trial" because this is a case where merits and jurisdiction determinations necessarily coincide. *See Continental Cas. Co. v. Dept. of Highways*, 379 F.2d 673, 675 (5th Cir. 1967). Moreover, the evidentiary hearing on the Plaintiff's preliminary injunction motion provided "the ordinary incidents of trial" on the injunction issues. *See id.* The Court is satisfied that the appropriate way to proceed is to hear and decide the factual issues bearing

---

[17] Defendant is a citizen of Florida; the other Members of InteliClear are citizens of New Jersey (Barretto) and New York (Powell and DeVito).

10

on its subject matter jurisdiction, recognizing that they also implicate elements of at least one of the substantive claims as well as the basis for the injunctive relief sought.

Absent relevant case law from and within the Second Circuit, the Court looks to how other Circuits that have addressed this intersection of subject matter jurisdiction and claims' merits. The Eleventh, Fourth and First Circuits have addressed this issue in the context of federal question jurisdiction at the motion to dismiss phase. *See Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981); *Garcia v. Copenhaver, Bell & Associates, M.D.'s, P.A.*, 104 F.3d 1256 (11th Cir. 1997); *United States v. North Carolina*, 180 F.3d 574 (4th Cir. 1999); *Torres-Negron v. J & N Records, L.L.C.*, 504 F.3d 151 (1st Cir. 2007). In *Williamson*, plaintiffs filed suit alleging that "joint venture interests" were securities within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. 645 F.2d at 416. The district court dismissed the case for lack of subject matter jurisdiction finding that "joint venture interests" were not securities. *Id.* at 409-10. The Fifth Circuit reversed, stating, "[i]n this case it is clear that the jurisdictional issue reaches the merits of the plaintiffs' case; if the joint venture interests and notes are not securities, there is not only no federal jurisdiction to hear the case but also no federal cause of action on the stated facts." *Id.* at 416.

Similarly, in *United States v. North Carolina*, the District Court's subject matter jurisdiction to dismiss a Title VII case on a motion to dismiss was challenged, despite the defendant's concession that the plaintiff had pled adequate jurisdictional facts in its complaint. 180 F.3d at 580. Because the defendant argued that those jurisdictional allegations were false, the court found itself in a position similar to this Court's. The Fourth Circuit held that "[w]hen a factual attack on subject matter jurisdiction involves the merits of a dispute, [t]he proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits

of the plaintiff's case" because the question of subject matter jurisdiction "is not suited for resolution in the context of a motion to dismiss." *Id.* at 580-81.

These cases provide some guidance on how to proceed when the merits of the case and the jurisdictional question are so entangled that it becomes impossible to separate them. While in this case the issue arises in the context of a motion for a preliminary injunction, the setting is analogous. Should the Court determine it does not have jurisdiction, it would be necessary to dismiss the case, whether in the context of deciding a motion for preliminary injunction or to dismiss. Likewise, where federal question jurisdiction depends upon the action "arising under the Constitution, laws, or treaties of the United States" 28 U.S.C. § 1331, diversity jurisdiction hinges, in part, upon each party being a citizen of a different state, 28 U.S.C. § 1332. Moreover, the rationale for assuming jurisdiction and for deciding the merits of the injunction applies with equal force in the context of both diversity and federal question jurisdiction. As the *Williamson* court noted, "[n]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits." 645 F.2d at 415–16.

The test articulated by the First Circuit is: "[i]f the plaintiff presents sufficient evidence to create a genuine dispute of material (jurisdictional) facts, then the case proceeds to trial, so that the factfinder can determine the facts, and the jurisdictional dispute will be reevaluated at that point." *Torres-Negron v. J & N Records, LLC*, 504 F.3d 151, 163 (1st Cir. 2007). For the reasons discussed below, here, Plaintiff has "presented enough evidence to create a genuine dispute of material jurisdictional facts." (*See id.*) Thus the Court finds that it has jurisdiction to rule on the motion for a preliminary injunction. Later, if Defendant were to prove he was not dissociated, the case would be dismissed for lack of jurisdiction.

12

### B.   Preliminary Injunction

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). Generally, a party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and (c) a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted). However, "[a] mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo, should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* at 35 n.4 (internal citations and quotation marks omitted).[18]

### i.   *Plaintiff has Established a Likelihood of Success on the Merits*

To warrant a preliminary injunction, Plaintiff "need not show that there is a likelihood of success on the merits of all of [its] claims for relief. Rather, [it] must show a likelihood of success on the merits of at least one of [its] claims." *Westchester Legal Servs., Inc. v. Westchester Cty.*, 607 F. Supp. 1379, 1382 (S.D.N.Y. 1985); *see also Kaufman v. Cooper Companies, Inc.*, 719 F. Supp. 174, 185 (S.D.N.Y. 1989) (granting a preliminary injunction where movant "demonstrated a likelihood

---

[18] Although Plaintiff's proposed preliminary injunction requests some mandatory aspects, requiring the higher standard, the Court is limiting the preliminary injunction to prohibitory relief only and the higher standard is not further addressed at this time.

13

of success on the merits of at least one of [its] claims.")); *Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 261 (E.D.N.Y. 2003) ("[I]n order to grant injunctive relief, the plaintiff's must show a likelihood of success on the merits of at least one of [its] claims.")). As described below, the Court finds that the evidence presented at the preliminary injunction hearing about Defendant's repeated misappropriation of Plaintiff's funds over which he had sole control supports the conclusion that he was a defaulting Member, and thus the process by which he was dissociated appears effective. This satisfies Plaintiff's burden of showing a likelihood of success on the merits on several of its claims.

   a. *Plaintiff has Sufficiently Established that Defendant is a Defaulting Member*

   The Court finds that Plaintiff has demonstrated that Barretto, Powell and DeVito had legitimate justification for believing that Defendant defaulted in the performance of his "covenants, obligations, responsibilities and undertakings" under the Agreements. (Pl.'s Ex. 1 ¶ 12.) As early as the end of 2015, Barretto, Powell and DeVito suspected Defendant was broadly misappropriating InteliClear funds and hired Ram Associates, an accounting and financial consulting firm, to investigate records that they became privy to as a result of the state court action but had not been otherwise able to obtain from Defendant in the ordinary course of business. (Transcript I at 150-52.)

   Most significantly, as Plaintiff claims, Plaintiff's American Express and bank records appear to show that Defendant treated InteliClear's accounts as his own personal piggy bank. The evidence showed that Defendant used Plaintiff's American Express card to purchase personal items such as a guitar costing over $500 for himself; airline tickets for his wife, daughter and even his daughter's former boyfriend, totaling well over $2,000; a gym membership costing over $1,000 for his wife (Transcript I at 115-22; Pl.'s Exs. 15, 16) and that he used InteliClear funds to pay his

14

personal credit card bill (Transcript I at 131-32; Pl.'s Exs. 17, 18). The evidence showed these charges and payments were not "reasonable and necessary business, educational and profession expenses" permitted by Paragraph 4(1) of the Members Agreement, nor reimbursable expenses under Paragraph 8.1 of the Operating Agreement. Additionally, they were not authorized by the other Members. (Transcript I at 155.) Plaintiff characterizes Defendant's actions as, in effect, stealing from Plaintiff, demonstrating that he is a defaulting Member under Paragraph 12 of the Members Agreement.

> b.   *Plaintiff is Likely to Succeed on the Merits of Counts One and Three*

Plaintiff's evidence of Defendant's material misappropriation of company funds for his personal use demonstrates its likelihood of success on the merits of its claims for breach of fiduciary duty[19] (Count One), and conversion[20] (Count Three). For both of these claims, whether

---

[19] "The essential elements to pleading a cause of action for breach of fiduciary duty under Connecticut case law are: (1) [t]hat a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) [t]hat the defendant advances his own interests to the detriment of the plaintiff; (3) [t]hat the plaintiff sustained damages; [and] (4) [t]hat the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." *AW Power Holdings, LLC v. FirstLight Waterbury Holdings, LLC*, No. CV146047836S, 2015 WL 897785, at *4 (Conn. Super. Ct. Feb. 17, 2015).

A member of a limited liability company has a fiduciary duty to the other members of the LLC. *See, e.g., Clinton v. Aspinwall*, Docket No. CV–13– 6042758–S, 2014 WL 1190079 (Conn. Super. Ct. Feb. 24, 2014); *Yavarone v. Jim Moroni's Oil Service, LLC*, Docket No. CV–03–0102318– S, 2005 WL 737010 (Conn. Super. Ct. Feb. 18, 2005).

[20] "The tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights. . . . Thus, [c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm." *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 770 (2006) (internal citations and

Defendant has been dissociated is irrelevant because they pertain to actions Defendant performed as a Member and General Manager. Therefore, the fact that Plaintiff has established a likelihood of success in proving Defendant was a defaulting Member, is sufficient for the Court to find a likelihood of success on the merits of Plaintiff's first and third Counts.[21]

> c. *Plaintiff's Likelihood of Success on the Merits of Counts Five and Six Depend Upon Whether Defendant was Properly Dissociated*

Count Five, tortious interference with business expectancies,[22] can only be established if Defendant was effectively dissociated from InteliClear and was no longer a member of it at the time of his alleged conduct of tortious interference. Plaintiff's Count Six seeks a declaratory judgment "that Victor has been properly dissociated as a [(sic)] InteliClear member and removed as its General Manager and Tax Matters Member and may not continue to act on InteliClear's behalf and that Barretto has replaced him as General Manager and Tax Matters Member." (Compl. ¶ 86.) At a minimum, the evidence shows that the question of Defendant's dissociation and his

---

quotation marks omitted). "Conversions may be grouped into two general classes: (1) those where the possession is originally wrongful; and (2) those where it is rightful and subsequently becomes wrongful." *Label Sys. Corp. v. Aghamohammadi*, 270 Conn. 291, 332 n.30 (2004) (emphasis added).

[21] Count Four is a request for an accounting, which is not a substantive cause of action, but rather a form of relief the Court may order. Therefore it is not analyzed under the likelihood of success on the merits standard.

[22] "It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000).

conduct thereafter constitutes a "sufficiently serious question[ ] going to the merits to make [it] a

fair ground for litigation." *See Citigroup Global Markets,* 598 F.3d at 35.[23]

### d.   Defendant was Dissociated Pursuant to a Legally Effective Process[24]

Plaintiff claims that Defendant has been properly dissociated under the procedure

provided for in the Members Agreement, which is read in conjunction with the Operating

Agreement. That procedure permits non-defaulting Members to treat the default of another

Member as a withdrawal under Paragraph 8.B of the Members Agreement. (Pl.'s Ex. 1 ¶ 12.)

Defendant contends that because the process by which he was dissociated is not provided for in

the Operating Agreement, it is not a legally effective method of dissociation. At this stage, the Court

is unpersuaded.

Whether the dissociation process Barretto, Powell, and DeVito utilized was effective

depends upon, in part, the interpretation of two contracts, made on the same day and by the same

parties, which appear inconsistent in some respects. First, the Operating Agreement defines

---

[23] This is technically a different standard than genuine issue of material jurisdictional fact, *see Torres-Negron,* 504 F.3d at 163, but "sufficiently serious question[ ] going to the merits to make [it] a fair ground for litigation" implicates the existence of a genuine issue of material fact such that the case should proceed past the preliminary injunction stage. *See Citigroup Global Markets,* 598 F.3d at 35.

[24] Defendant argues that Barretto and Powell admitted they did not have the authority to dissociate him in the 26(f) report they filed when Defendant's 2015 action was removed to federal court. In the report Barretto and Powell requested that the district court remove Defendant as General Manager because they did not have the supermajority interest (75%) required by Article 6.2 of the Operating Agreement. Defendant's argument is inapposite. Plaintiff is not contending that the other Members utilized Article 6.2 of the Operating Agreement to dissociate Defendant. Instead, Barretto, Powell and DeVito assert that they dissociated Defendant pursuant to Paragraph 12 of the Members Agreement, an entirely distinct procedure that did not require a supermajority. Once Defendant was dissociated, the remaining Members voted unanimously to remove him from the position of General Manager.

"Agreement" as "this written Operating Agreement of Members of the Company, which is binding on all Members . . . [and] NO ORAL AGREEMENTS OR ANY DOCUMENTS OR WRITINGS SHALL BE PART OF THE AGREEMENT, unless [it] constitutes a properly approved amendment." (Pl.'s Ex. 2 ¶ I) (emphasis in original). Neither party suggests that there has been any amendment to the Operating Agreement. However, the same day that the Members entered into the Operating Agreement they also entered into the Members Agreement, a similarly binding contract, which, in Section One, incorporates by reference the Operating Agreement. Furthermore, in addition to incorporating the Operating Agreement, the Members Agreement, in that same section states that "in the event of any conflict between the provisions of the Operating Agreement and this Members Agreement, the provisions of this Members Agreement shall be applied and control." (Pl.'s Ex. 1 ¶ 1.)

The two contracts both refer to the same transaction, namely the creation of InteliClear, and thus "the writings should be considered together to determine the intent of the parties." *See e.g.*, *Frantz v. Romaine*, 93 Conn. App. 385, 395 (2006) (quoting *669 Atl. St. Associates v. Atl.-Rockland Stamford Associates*, 43 Conn. App. 113, 123 (1996). Here it is expressly provided that if these two agreements conflict, the Members Agreement is to control. Plaintiff further argues that the Members Agreement should be deemed an "operating agreement" within the meaning of the Connecticut LLC Act, which defines an "operating agreement" as "any agreement, written or oral, as to the conduct of the business and affairs of a limited liability company, which is binding upon all of the members" CONN. GEN. STAT. ANN. § 34-101, as both the Operating Agreement and the Members Agreement are. Notwithstanding some lingering friction between the two documents, the Court is satisfied that Plaintiff established a likelihood of success in showing that the

dissociation procedure provided for within the Members Agreement qualifies as a legally effective process by which a defaulting Member may be dissociated.

> e.  *The Court Need Not Determine Whether the Other Members Were Also Defaulting Members at This Stage of the Proceedings*

Defendant argues that it was not possible for Barretto, Powell, and DeVito to dissociate him under Paragraph 12, even assuming such method is effective, because the other Members were not "non-defaulting" Members entitled to take this action under the terms of the Agreements. Nowhere in either Agreement is there a definition of "non-defaulting Members" or "default." Lacking these definitions, there is no clarity on the signatories' intent as to the caliber, duration and degree of detriment constituting default. S*ee United Illuminating Co. v. Wisvest-Connecticut, L.L.C.*, 259 Conn. 665, 670–71 (2002) ("a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself.").[25] It is sufficient that the interpretation of the meaning of "default" in the contract would likely cover substantial misappropriation of corporate funds and thus presents a "sufficiently serious question[ ] going to the merits [of Plaintiff's claims that Defendant tortiously interfered with Plaintiff's business expectancies] to make [it] a fair ground for litigation," which satisfies the standard for issuing a preliminary injunction. *See Citigroup Global Markets,* 598 F.3d at 35.

---

[25] The evidence presented at the hearing did not bear on this issue, focusing only on prior actions claimed by Defendant to constitute prior "default" of other Members but which he never formally declared. In the Members Agreement the term "non defaulting Members" is plural, indicating a need for the agreement of at least two individuals, but no more. Therefore, under this reading, if any two of Barretto, Powell, or DeVito were non-defaulting Members, Defendant's dissociation would still be effective.

### ii.      Absent an Injunction Plaintiff Will Suffer Irreparable Harm and the Balance of Hardships Tips Decidedly in Favor of Plaintiff

There is no question that the future of InteliClear, an apparently successful business, is being irreparably harmed by the current state of affairs. Plaintiff's bank account is frozen, leaving it unable to pay vendors or consultants that work for the company. (Transcript I at 201.) Additionally, clients have been left in a state of confusion, as Defendant and Plaintiff have each directed them to send their payments to different places. (*See* Pl.'s Ex. 8.) As a result, InteliClear is hamstrung in its operations because clients, aware of appearances of some sort of internal struggle for control, have informed Plaintiff that they are withholding their payouts essentially until the dust settles. (Transcript I at 202.)

The result of the dissociative actions by the majority of Members has not resulted in the restoration of revenue flows nor in consistent messages being sent to clients, suppliers etc.. Moreover, Plaintiff will continue to suffer irreparable harm without an injunction, given the evidence showing that Defendant moved all of the records and property to his new residence in Florida (*id.* at 13-19) and promptly registered InteliClear to do business in the state of Florida (*see* Pl.'s Ex. 6) without any notice to or approval of the other Members as required under the Agreements (*See* Pl.'s Mem. Supp. Mot. for Preliminary Injunction at 9; Transcript II at 266-67). The evidence further showed that he wrote himself a September draw (*see* Transcript I at 45), and transferred a substantial amount of the funds from InteliClear's Union Savings account to an account he unilaterally opened in Tampa Bay (*see id.* at 39-40). Meanwhile, the remaining three Members continue to operate from the New Jersey office to which they moved InteliClear.[26]

---

[26] A noted above, it is disputed as to when the principal office was moved to New Jersey. *See* footnote 13 *supra.* Plaintiff contends it was effectively relocated pursuant to the August 17,

Defendant will not discontinue his actions and continues to view himself as the general manager of InteliClear. (Transcript I at 72).

The Court recognizes that in order for InteliClear to survive, at least a narrow interim injunction is required to ensure that, at minimum, Plaintiff can continue its operations and to receive and make payments pending further pleadings in this case. Such a narrowly drawn preliminary injunction will not impose a significant hardship on Defendant. As things currently stand, the affairs of Plaintiff cannot be effectively managed by anyone. Even Defendant has only limited ability to act on behalf of InteliClear due to the chaotic state of affairs and the fact that the remaining Members publicly claim he is no longer associated with the company. Imparting some order and structure to ensure the interim survival of InteliClear while this litigation proceeds is not an immediate hardship for Defendant. Should Defendant later succeed in proving he remains a member of InteliClear and/or is entitled to the value of his interest, he too benefits from the immediate stabilization of the operations of the company. The Court concludes that the hardship Plaintiff will face should a preliminary injunction not issue substantially outweighs the hardship Defendant will face as a result of such injunction, and consequently, that the balance of hardships tips decidedly in favor of Plaintiff InteliClear.

---

2015 resolution (Pl.'s Ex. 10) passed by a simple majority. It argues that pursuant to Article 2.3 of the Operating Agreement only a majority in interest is required to move the principal office. Defendant argues that Article 2.3 refers only to "office," which under the agreement is not defined as being the principal office and therefore that a majority in interest does not suffice to move the *principal* office. (*See* Transcript II at 430.)

**C.   The Court Finds the Remainder of Defendant's Arguments Unpersuasive in the Context of the Motion for Preliminary Injunction[27, 28]**

*i.    Plaintiff Did Not Violate 28 U.S.C. § 1359*

The Court concludes that there is no evidence that Plaintiff has manufactured federal diversity jurisdiction in violation of 28 U.S.C. § 1359.[29] "In determining whether the parties have improperly manufactured federal jurisdiction, the essential inquiry is whether there is a bona fide controversy between . . . citizens of different states," *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 125

---

[27] While Defendant claims that InteliClear's current counsel has a conflict and thus cannot properly bring this action on behalf of InteliClear, he has filed no motion to disqualify counsel and thus the Court will not address this argument.

[28] Defendant also contends that InteliClear, as an entity, does not have standing to pursue the critical question of whether Defendant was properly dissociated, and thus cannot properly bring this case. (Def.'s Mem. in Opp'n to Pl.'s Mot. for Preliminary Injunction at 16.) He argues that Powell and Barretto have filed this action in which InteliClear "purports to assert [Powell and Barretto's] personal claims under a Members Agreement to which InteliClear is not even a party." (*Id.* at 16-17.) "The party invoking federal jurisdiction bears the burden of establishing [the following] elements" of standing: (1) an "injury in fact" suffered by the plaintiff; (2) a causal connection between the injury and the conduct complained of; and (3) that is "likely" the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). Given that Defendant admits that "certain of the claims asserted in this action, such as the claims that Victor harmed InteliClear by misappropriating its property, are claims that may be asserted by InteliClear" (Def.'s Mem. in Opp'n to Pl.'s Mot. for Preliminary Injunction at 19 n. 7), thus conceding that Plaintiff has standing at least as to certain of its claims on which the injunctive relief is based, and given the fact that the Operating and Members Agreements under which the dissociation took place were intended for Plaintiff's benefit, the Court is satisfied that Plaintiff has established that it has standing.

[29] That statute reads: "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C.A. § 1359.

(2d Cir. 2003), as amended (Apr. 16, 2003) (quoting *Md. Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 623 (2d Cir.1993)) (internal quotation marks omitted) or, on the other hand, whether there is an "agreement whose primary aim is to concoct federal diversity jurisdiction." *Airlines Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857, 862 (2d Cir. 1995) (internal quotation marks omitted). While the issue of diversity jurisdiction was raised in the earlier removal to federal court, no evidence presented at the hearing establishes that the sole purpose of dissociating Defendant was to manufacture federal diversity jurisdiction. Rather, the evidence indicates that over a period of time, beginning at least a year before this action was commenced, the relationship between Defendant and the other Members had deteriorated. The evidence shows that the "primary aim" of the agreement to dissociate Defendant was to remove him from InteliClear to gain orderly control of the company. While the dissociation, which removed Defendant from the LLC's citizenship analysis, resulted in diversity jurisdiction where otherwise it would not have existed, this coincidence does not rise to the level of improperly manufacturing jurisdiction where the dissociation action reflects the core of the Members' dispute.

### ii. Whether the Other Members Owed Defendant a Fiduciary Duty

Although not raised in his brief, Defendant, relying upon *Konover Dev. Corp. v. Zeller*, 228 Conn. 206 (1994), argued at the preliminary injunction hearing that "where the terms of the partnership agreement appear to provide something that gives a partner the unfair discretion to do something that would be significantly negative to the interests of the other partners . . . there's an overarching . . . fiduciary obligation to take into consideration the other members' interests." (Transcript II at 288-89.) Application of this principle does not mean that the other Members could not properly dissociate a defaulting Member. Defendant too, especially as General Manager, owed a fiduciary duty to the other Members and to InteliClear. *See Konover*, 228 Conn. at 218. That he

failed to fulfill this duty is evidenced by his repeated, undisclosed use of company funds for clearly personal purposes. Regardless of whether the other Members owed Defendant a fiduciary duty, the Court finds that Plaintiff has met the standard for issuing a preliminary injunction.

## III.    Conclusion

For the foregoing reasons, Plaintiff's Motion [Doc # 11] for Preliminary Injunction is GRANTED in part, to permit InteliClear's business to continue to function pending further proceedings in this case. For purposes of the order, "Plaintiff" refers to InteliClear as an entity, by and through the actions of its remaining Members, Barretto, Powell and DeVito, as well as their employees and agents. No bond or security will be required at this time.

It is hereby ORDERED that Defendant, Robert J. Victor, and all other persons in active concert or participation with him, are ENJOINED from:

1. Holding Victor out as a member, General Manager, and Tax Matters Member of InteliClear;

2. Continuing to act on InteliClear's behalf in any manner;

3. Filing any tax returns or amended returns on InteliClear's behalf;

4. Interfering with InteliClear's continuing business and customer relations, opportunities, and expectancies;

5. Dispersing, dissipating, spending or obligating any monies owed to InteliClear or in any InteliClear bank account, including Sun Trust, Wells Fargo or Union Savings;

6. Using any address for InteliClear business other than 40 Brunswick Ave., Suite 210, Edison, NJ;

7. Moving, removing, tampering, destroying or altering any of Plaintiff's books, records or property in any way.

IT IS SO ORDERED this 3rd day of October at New Haven Connecticut at 4:33 P.M.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 3rd day of October 2016.

25