UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| INTELICLEAR, LLC; A. MARTINHO BARRETTO; JOHN PAUL DEVITO; and GUY T. POWELL, *Plaintiffs*, *v.* ROBERT J. VICTOR, *Defendant.* | Civil No. 3:16cv1403 (JBA) September 1, 2017 |

**RULING ON COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING AND FAILURE TO STATE A CLAIM**

Plaintiff InteliClear filed this action on August 17, 2016 against Defendant Robert J. Victor ("Victor") alleging breach of fiduciary duty (Count One); civil theft in violation of Conn. Gen. Stat. § 52-564 (Count Two); conversion (Count Three); and demanding an accounting of all financial transactions regarding InteliClear assets and funds performed by Victor or at his direction (Count Four). On September 1, 2016 Plaintiff filed an Amended Complaint [Doc. # 10] adding a claim for tortious interference with business expectancies (Count Five); and seeking a declaratory judgment (Count Six). On January 19, 2017 InteliClear filed its Second Amended Complaint [Doc. # 66], in which Barretto, Powell, and DeVito joined the case as plaintiffs. Defendant's Answer [Doc. # 83] was filed February 15, 2017.

Victor also filed an Amended Counterclaim ("Counterclaim") [Doc. # 78] February 13, 2017 asserting ten counterclaims against Powell, Barretto, DeVito and Brandon Consulting ("Brandon").[1] In his individual capacity, Counterclaim Plaintiff Victor asserts the following claims:

---

[1] The counterclaims against Brandon itself were dismissed pursuant to this Court's Order. (*See* Order Denying Defendant's Motion for Extension of Time Pursuant to Rule 4(m) to Serve Brandon [Doc. # 150].) Additionally, although Victor did not name InteliClear as a Counterclaim Defendant in the caption of his Counterclaim, Counts Three, Five, Nine are all specifically asserted

(1) an injunction against all Counterclaim Defendants (Count One); (2) damages for conspiracy against all Counterclaim Defendants (Count Two); (3) breach of contract against Powell, Barretto, DeVito and InteliClear (Count Three); (4) fraud/intentional misrepresentation against Powell, Barretto, DeVito and InteliClear (Count Five); (5) breach of fiduciary duty against Powell, Barretto and DeVito (Count Seven); (6) reformation of the Operating Agreement provisions relating to dissociation of Members (Count Nine); and (7) a declaratory judgment of the parties' rights and responsibilities under the Operating Agreement and the Members Agreement against Powell, Barretto, DeVito and InteliClear (Count Ten). Derivatively, on behalf of InteliClear, Victor asserts as counterclaims: (1) tortious interference with business relationships against Powell, Barretto and DeVito (Count Four); (2) fraud/intentional misrepresentation against Powell, Barretto, and DeVito (Count Six); and (3) violations of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a et seq. ("CUTPA") against Barretto (Count Eight).

Counterclaim Defendants InteliClear, Barretto, Powell and DeVito ("Counterclaim Defendants") move [Doc. # 89] for dismissal of Counts One through Nine of the Amended Counterclaim. Oral argument was held July 5, 2017. For the reasons that follow, Counterclaim Defendants' Motion is granted in part and denied in part.

## I.  Facts Alleged

Victor began to work on the design of a new securities clearing and settlement software product in 2002, and over the next several years he invested substantial time, effort, and resources in developing the product. (Amended Counterclaim ("Am. Counterclaim") ¶¶18-19.) In January

---

against InteliClear. Counts One and Two are asserted against "all Defendants." Thus the Court reads the Counterclaim as asserting these five claims against InteliClear.

2005 Powell, Barretto and DeVito joined as Members of the Company and InteliClear adopted its present name, Operating Agreement, and Members Agreement. (*Id.* ¶¶ 23-24, 28.)

Victor was appointed General Manager[2] with broad powers to run the Company. (*Id.* ¶ 29.)[3] Under Victor's management, InteliClear grew and achieved a high level of success. (*Id.* ¶ 27.) As the value of InteliClear increased and a pending transaction which would provide a substantial benefit to InteliClear and its Members approached fruition in August 2015, Powell, Barretto, and DeVito, undertook actions in contravention of the Operating Agreement, to take over control of InteliClear and force Victor out of the company, resorting to disparagement, threats, intimidation, and extortion. (*Id.* ¶¶ 34-35.) Their actions caused this transaction to fail, resulting in harm to InteliClear's business and reputation. (*Id.* ¶¶ 58-59.)

Specifically, the other Members passed "Resolutions" that were not approved by the requisite voting percentage of the Members to: (a) remove Victor as General Manager; (b) change the Company's principal office; (c) close its bank accounts and take control of its funds; (d) open a new bank account and write unauthorized checks; (e) interfere with the Company's customer relationships and sources of revenue; and (f) interfere with Victor's ability to make a living. (Am. Counterclaim ¶36-38.) When Powell, Barretto, and DeVito directed InteliClear's bank to close its accounts in Connecticut, the bank froze the accounts. (*Id.* ¶ 39.) They also opened a new and unauthorized bank account in New Jersey, over which Victor had no signature authority, and

---

[2] Section 6.1 of the Operating Agreement establishes the office of General Manager.

[3] The Operating Agreement requires an affirmative vote of a "Super Majority in Interest" of at least 75% of the membership interests held by all Members in order for it to be amended. (Am. Counterclaim ¶31.) The Members' percentage interests in InteliClear are: Powell-31.66%; Barretto-31.67%; Victor-31.67%; and DeVito-5.00%. (Am. Counterclaim ¶ 32.)

executed a lease for the Company's office space in New Jersey that was not authorized by Victor. (*Id.* ¶¶ 40, 43.)

Victor also alleges that Powell and Barretto conspired with Brandon, a company controlled by Barretto that provides computer programmers and other services to InteliClear. (*Id.* ¶¶ 44–45.) Because Brandon did not keep proper records of its activities on behalf of InteliClear, neither InteliClear nor Victor were able to determine whether Brandon's charges were justified by the services it purported to provide, nor could they identify work or services which may be properly chargeable to clients. (*Id.* ¶¶ 44-47.) Barretto eventually told Victor that there was only a nominal markup of approximately three percent and also claimed that Victor had been aware of this markup. However, when Victor demanded to know the actual markup and requested documentation, Barretto refused to provide the information, claiming it was proprietary to Brandon. (*Id.* ¶¶ 48-49.) Victor believes the actual markup imposed by Brandon is higher than three percent and a reasonable estimate of the cumulative amount of the markup is hundreds of thousands of dollars. (*Id.* ¶¶ 50-53.)

InteliClear's governance over the years was informal and its policies regarding Members' benefits and expense allowances had been liberal. (Am. Counterclaim ¶ 60.) In addition, Powell and Barretto have repeatedly obligated InteliClear to pay sums in excess of $5,000 without the Super Majority Vote required by its Operating Agreement. (*Id.*) Nonetheless, in what Victor claims to be an effort to force him out of the Company, Powell, DeVito and Barretto demanded extensive documentation regarding Victor's expenses going back to the inception of InteliClear, and used this information in order to claim, and to cause InteliClear to claim, misconduct by Victor. (*Id.* ¶ 62.) Despite this, Powell and Barretto have refused to hold their own claims for expense payment

and reimbursement to the same standard and have routinely charged and been reimbursed for items that are not ordinary business expenses. (*Id.* ¶¶ 63-64.)

In September 2015, Powell and Barretto's actions led Victor to commence an action in the Connecticut Superior Court, which included a Verified Complaint and Application for Temporary and Permanent Injunction ("the Litchfield Action"). (*Id.* ¶ 65.) Victor also sought an order in the Litchfield Action directing the defendants to provide him a full and functioning version of InteliClear's software accessible by computer. (*Id.* ¶ 66.) On October 13, 2015 the parties to that Action entered into a stipulated agreement on the record. (*Id.* ¶¶ 67-68.) The agreement entered as an Order of the court and included that Powell and Barretto would not further interfere with InteliClear's bank accounts. (Am. Counterclaim ¶ 68.) They also agreed (and the Court directed) that disputes concerning InteliClear, which the parties could not resolve, would be submitted to Justice C. Ian McLachlin (Ret.) for resolution. (*Id.* ¶ 69.) Based upon these agreements, a scheduled hearing on the application for injunction in the Litchfield Action was cancelled. (*Id.* ¶ 70.) On May 26, 2016 the defendants removed the Litchfield Action to federal court (the "Federal Action"). On August 12, 2016, Victor filed a voluntary dismissal of the Federal Action, without prejudice. (*Id.* ¶ 72.)

On August 16, 2016, Powell, Barretto, and DeVito, denominating themselves "non-defaulting parties" under the parties' "Members Agreement," purported to dissociate Victor as a Member of InteliClear and to remove him as its General Manager. (*Id.* ¶ 74.) The next day, Powell, Barretto, and DeVito, claiming to act as the sole members of InteliClear, and Barretto, claiming to act as General Manager, again caused InteliClear's bank to freeze its account and attempted to move the funds to a bank account in New Jersey over which Victor has no access. (Am.

Counterclaim ¶ 75.) That same day, August 17, 2016, Powell and Barretto caused InteliClear to initiate the instant federal court action against Victor. (*Id.* ¶ 76.)

These more recent actions by Powell, Barretto and DeVito were taken soon after Victor presented them with a memorandum and term sheet for a transaction, potentially worth more than twelve million dollars, for the sale of the company and soon after Victor made additional efforts to stop their unauthorized actions and require accountability for payment of services to Brandon. (*Id.* ¶ 78.) Their actions caused InteliClear to lose the opportunity to complete the potential sale. (*Id.*)

On August 23, 2016 Powell, Barretto and/or DeVito filed documents with the Connecticut Secretary of State, purportedly on behalf of InteliClear, reflecting their purported removal of Victor as General Manager and Member of InteliClear. (*Id.* ¶ 81.) Powell, Barretto and/or DeVito, also contacted InteliClear's clients and misrepresented to them the validity of their actions with respect to InteliClear and directed clients to send payments to addresses and accounts controlled by them. (*Id.* ¶ 82.) Powell, Barretto and DeVito also misrepresented to clients that there has been a final determination that Victor is dissociated from InteliClear and that he embezzled funds and changed their proportionate shares of the business to reflect that they are entitled to larger percentages due to their purported removal of Victor. (*Id.* ¶¶ 83-84.)

## II.  DISCUSSION[4]

### A.  Victor has Standing to Assert Derivative Claims on Behalf of InteliClear

Victor asserts claims for Tortious Interference with Business Relationships (Count Four), Fraud (Count Six), and Unfair Trade Practices (Count Eight) derivatively on behalf of InteliClear. Counterclaim Defendants maintain Victor lacks standing to pursue his derivative claims because he does not adequately represent InteliClear's interests. (Def.'s Mot. to Dismiss at 27.) Victor maintains that he has standing to sue derivatively because, as the sole member whose interests have been targeted individually and who has not participated in the self-dealing and conflict of interest transactions alleged in his Counterclaim, he adequately represents the interests of the only member who would assert these claims. (Pl.'s Opp'n at 28.)

Conn. Gen. Stat. § 52-572j provides in relevant part:

> Whenever any corporation or any unincorporated association fails to enforce a right which may properly be asserted by it, a derivative action may be brought by one or more shareholders or members to enforce the right. . . . The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association.

Similarly, Conn. Gen. Stat. § 33-721 provides: "[a] shareholder may not commence or maintain a derivative proceeding unless the shareholder . . . (2) fairly and adequately represents the interests

---

[4] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

of the corporation in enforcing the right of the corporation."[5] In turn, "[a]dequate and fair representation consists of the nominal plaintiff's having interests and issues coextensive with those of the class of shareholders he seeks to represent and being able to assure the trial court that as a representative, he will put up a real fight." *N. Star Contracting Corp. v. Albright*, 156 Conn. App. 311, 318 (2015) (citing *Barrett v. S. Conn. Gas Co.*, 172 Conn. 362 (1977)). "The real issue is whether an inquiry of all possible antagonisms between the interests of the representative and those of the class . . . reveals conflicts which make it likely that the interests of the other stockholders will be disregarded in the management of the suit." *Barrett*, 172 Conn. at 374 (internal citations and quotation marks omitted).

In *Barrett*, the Connecticut Supreme Court noted that an important factor in considering whether a "nominal plaintiff has conflicts that preclude assurance of fair and adequate representation of all other shareholders" is whether the plaintiff has previously brought an action individually against the company he or she now purports to represent. *Id.* at 374–75. However, Connecticut courts have recognized that even a plaintiff who may have a claim against a company can still adequately represent the interests of that company in a derivative action. *Beckworth v. Bizier*, 138 F. Supp. 3d 144, 153–54 (D. Conn. 2015) (citing *Barrett*, 172 Conn. at 373) ("*Barrett* . . . does not hold that a plaintiff with possible individual claims against the corporation can never

---

[5] Although Title 33 of the Connecticut General Statutes governs corporations, courts in Connecticut have applied certain provisions of Title 33, including Conn. Gen. Stat. § 33-721, to derivative actions involving limited liability companies, such as InteliClear. *See, e.g., Calpitano v. Fountain Pointe, LLC*, No. CV126014893, 2014 WL 660419, at *4 (Conn. Super. Ct. Jan. 21, 2014) (applying Conn. Gen. Stat. § 33-721 to determine whether member of limited liability company had standing to bring action on company's behalf).

fairly and adequately represent other shareholders in a derivative action.").[6] "Whether a plaintiff is an appropriate representative is fact-specific and depends upon any number of factors," including:

> (1) whether the named plaintiff is the real party in interest; (2) the plaintiff's familiarity with the litigation and willingness to learn about the suit; (3) the degree of control exercised by attorneys over the litigation; (4) the degree of support given to the plaintiff by the other shareholders; (5) the plaintiff's personal commitment to the action; (6) the remedies sought by the plaintiff; (7) the relative magnitude of the plaintiff's personal interests as compared to the plaintiff's interest in the derivative action itself; and (8) the plaintiff's vindictiveness toward the other shareholders.

*Fink v. Golenbock*, 238 Conn. 183, 205 (1996).

Here, nearly all of the factors weigh in favor of finding Victor has standing to pursue the claims on behalf of InteliClear.[7] As the only shareholder not involved in the actions forming the basis for the derivative claims, Victor is the real party in interest and is more than sufficiently familiar with and committed to the litigation. Moreover, the court in *Beckworth* concluded with respect to the seventh *Fink* factor: where "no party other than the plaintiffs is likely to pursue the derivative claims against the defendants," because the remaining parties are alleged to have

---

[6] Victor contends Counterclaim Defendants erroneously argue that Victor sued InteliClear in the Litchfield Action and therefore, he cannot adequately represent the interests of the company in a derivative action. Victor reminds the Court that he initially named InteliClear as a nominal defendant only, as it had interests in the initial Litchfield action that were adverse to Powell and Barretto's interests. For the short period that InteliClear remained a nominal party in the Litchfield Acton it was represented by separate counsel and its position and interests were aligned with Victor as a plaintiff, though it was nominally a defendant. As such, Victor argues he did not "sue" InteliClear in any sense that would prohibit him from asserting a derivative claim on its behalf in this case. (Pl.'s Opp'n at 29.)

[7] The Court discusses only the most relevant factors considering the particular facts of this case.

benefitted from the alleged unlawful actions, the plaintiffs' interest in the derivative claims was "not outweighed by their personal interests." 138 F. Supp. 3d at 154. In so holding, the court found significant that the plaintiff had abandoned all claims in "direct conflict with those of the corporations they seek to represent." *See id.* at 153. Similarly, Victor's individual claims do not conflict with InteliClear's claims and thus the seventh factor also weighs in favor of finding Victor has standing.

In sum, Victor is the only individual who would assert the claims in Counts Four, Six and Eight on behalf of InteliClear because they are grounded in actions taken by the remaining Members. Thus, there are no similarly situated shareholders or members to whom consideration must be given and Victor has standing to assert claims derivatively on behalf of InteliClear.

## B. Counterclaim Defendants Argue Counts One Through Nine Fail to State Claims Upon Which Relief can be Granted

### i. Count One: Injunction

In Count One of his Amended Counterclaim, "Victor seeks an injunction requiring that InteliClear recognize his ownership interest and rights as General Manager and rescind the improper and unlawful actions taken by the other members by which they have purported to seize control of InteliClear." (Am. Counterclaim ¶ 90.) Counterclaim Defendants, looking to federal law, argue that an injunction cannot stand as an independent cause of action. *See E. Point Sys., Inc. v. Maxim*, No. 3:13-CV-00215 VLB, 2014 WL 523632, at *12 (D. Conn. Feb. 7, 2014) ("*E. Point I*") (quoting *Williams v. Walsh*, 558 F.2d 667, 671 (2d Cir.1977)) ("injunctive relief, does 'not constitute [a] separate' cause of action."). Victor, however, relies upon Connecticut state law, which recognizes a claim for an injunction as a viable free-standing cause of action. *See Baker v. Town of Cheshire,* No. CV075013602, 2008 WL 1971495, at *9 (Conn. Super. Ct. Apr. 24, 2008*),*

*aff'd in part, rev'd in part sub nom. Ugrin v. Town of Cheshire*, 307 Conn. 364, 54 A.3d 532 (2012) ("[i]t appears that a majority of Connecticut courts have recognized a claim for an injunction as a viable free-standing cause of action."); *Frantz v. Romaine*, No. CV000176623S, 2001 WL 358861, at *2 (Conn. Super. Ct. Mar. 28, 2001) (finding that the "plaintiff . . . alleged a legally sufficient cause of action for an injunction.").

Counterclaim Defendants urge that "[t]he manner of procedure in suits seeking injunctive relief is governed by federal law." (Counterclaim Def.'s Reply ("Def.'s Reply") at 2 (citing 13 James Wm. Moore, Moore's Federal Practice § 65.07[1] (2011).) However, in at least two other diversity cases, federal district courts looked to state law to determine whether an injunction could be pled as an independent cause of action. *See In re A Purported Judgment Lien Against Rose Ann Juarez*, No. 3:14-CV-2173-P, 2015 WL 12939259, at *3 (N.D. Tex. Mar. 20, 2015) ("injunctive relief is not an independent cause of action under Texas law, and thus granting an injunction is contingent on a viable underlying claim."); *Durr v. Bank of Am.*, NA, No. 12-11840, 2013 WL 6050140, at *7 (E.D. Mich. Nov. 15, 2013) (citing state court of appeals for proposition that "an injunction is an equitable remedy, not an independent cause of action."). Accordingly, because an injunction is recognized as a freestanding cause of action under Connecticut law, Count One should not be dismissed on that basis.

Because Victor's Counterclaim asserts a cause of action for an injunction, which is recognized under Connecticut law, but not federal, the court will look to state law to determine what he must plead to state this claim. The Connecticut Supreme Court has held that a "party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." *Tighe v. Berlin*, 259 Conn. 83, 87 (2002). "Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the

injunction, the party seeking it will suffer irreparable harm." *Id.* at 87-88. Counterclaim Defendants argue that "notwithstanding oblique references to his 'livelihood' and the 'unique value of his interest as a Member of InteliClear,' Victor fails to show that his distributions and other benefits or his interest in the company cannot be monetized." (Def.'s Reply at 2.) While Connecticut courts do not appear to have spoken on this issue, the Second Circuit recognizes that "the denial of a controlling ownership interest in a corporation may constitute irreparable harm." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003). The Court thus finds that Victor has sufficiently pled irreparable harm and thus denies Counterclaim Defendants' Motion to Dismiss Count One.[8]

### ii. Count Two: Civil Conspiracy

Victor alleges civil conspiracy among InteliClear, Powell, Barretto, and DeVito with Brandon "to commit fraud, tortiously interfere with business relationships . . . [and] to allow Brandon to impose, collect and retain charges that are excessive and unfair." (Am. Counter Claim ¶¶ 85-86.) Counterclaim Defendants maintain that Victor has not alleged facts sufficient to establish that any of the alleged acts constitute a substantive tort that can form the basis of his civil conspiracy claim. (Counterclaim Def.'s Reply ("Def.'s Reply") at 3.)

---

[8] Counterclaim Defendants read Victor's Count One as seeking an injunction only against InteliClear despite the reference in the heading of the count to "All Defendants" because the Counterclaim specifically states that Victor "seeks an injunction requiring that InteliClear recognize his ownership interest and rights as General Manager and rescind the improper and unlawful actions taken by the other members by which they have purported to seize control of InteliClear." (Am. Counterclaim ¶ 90.) Reading the Counterclaim in the light most favorable to Victor, this is sufficient to state a claim for an injunction against Powell, Barretto, and DeVito, who at this time are the sole remaining members of InteliClear.

"The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Marshak v. Marshak*, 226 Conn. 652, 665 (1993) *overruled on other grounds State v. Vakilzaden,* 251 Conn. 656 (1999*)* (internal quotation marks omitted). However, there is no independent cause of action for civil conspiracy. Rather, "[t]he action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. . . . Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Harp v. King*, 266 Conn. 747, 779 n.37 (2003); *Halo Tech. Holdings, Inc. v. Cooper*, No. 3:07-CV-489 SRU, 2010 WL 1330770, at *9 (D. Conn. Mar. 31, 2010) ("For [the plaintiff] to recover damages on a civil conspiracy claim, it must allege facts necessary to satisfy the elements of an independent underlying cause of action."); *see also Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 636 (2006) ("The purpose of a civil conspiracy claim is to impose civil liability for damages on those who agree to join in a tortfeasor's conduct and, thereby, become liable for the ensuing damage, simply by virtue of their agreement to engage in the wrongdoing.").

Victor's Opposition summarizes the actions Counterclaim Defendants took which he maintains form the basis of his civil conspiracy claim as the following: "improperly, unlawfully and without authorization . . . depriv[ing] him and tak[ing] as their own, all of his rights and privileges in InteliClear, including his ownership rights and his positions as General Manager and Member of InteliClear"; "improperly enrich[ing] themselves by intentionally breaching the Operating Agreement, through their tortious interference with contractual relations, their breaches of fiduciary duties owed to him, and through fraud, misrepresentation, defamation and extortion;"

and "Brandon's pillaging of InteliClear."  (Pl.'s Opp'n at 13 (citing Amended Counterclaim ¶¶ 53, 85 at 21).)

As discussed below, Victor's breach of contract, fraud, tortious interference with business relations, and CUTPA claims do not survive this Motion to Dismiss and therefore cannot provide the basis for his civil conspiracy claim. Additionally, even if Victor had adequately pled a substantive tort, his conclusory allegation that the other Members and Barretto "conspired to allow Brandon to impose, collect and retain charges that are excessive and unfair" does not plausibly state a claim of civil conspiracy absent any factual allegations demonstrating Barretto and the other Members actually formulated a scheme with the purpose of permitting Brandon to retain "excessive and unfair charges." (*See* Am. Counterclaim ¶ 86 at 21.) Thus, Victor's civil conspiracy counterclaim is dismissed.

### iii.   Count Three: Breach of Contract

Victor alleges Counterclaim Defendants breached "the InteliClear Operating Agreement and the Members Agreement, as well as agreements entered into in connection with prior court proceedings" by "improperly depriv[ing] Victor of his rights as a member and General Manager of InteliClear, including his right to distributions and other benefits of his ownership interest . . ." (Am. Counterclaim ¶ 85.) He further alleges that "InteliClear, through the actions of its other members, breached its obligations to Victor by removing him as General Manager and Member and/or allowing his removal." (*Id.*) Counterclaim Defendants argue this claim must fail because Victor fails to allege that InteliClear, Powell, Barretto, or DeVito actually breached any terms of

the contract, where Victor had no contractual right to the distributions to which he claims he is being deprived or to the position of the General Manager. (Def.'s Mot. To Dismiss at 17.)[9]

"Under Connecticut law, [t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Larobina v. Wells Fargo Bank, N.A.*, No. 3:10-CV-1279 MRK, 2012 WL 1032953, at *8 (D. Conn. Mar. 27, 2012) (quoting *Chiulli v. Zola*, 97 Conn.App. 699, 706–07 (2006) (internal quotation marks omitted)).[10]

Victor does not allege that the other Members breached any specific provision of the Members Agreement in dissociating him, and in fact, his Amended Counterclaim avoids mentioning the provisions of the Agreements the other Members claim to have used to dissociate him. However, Article IX of the Operating Agreement permits the dissociation of a member[11] and

---

[9] Counterclaim Defendants also argue Victor has failed to allege he performed under the terms of the contract and thus his breach of contract fails on that ground as well. The Court will not address this argument because it agrees Victor has not adequately alleged Counterclaim Defendants breached any agreement.

[10] Victor asserts several times in his Opposition that "[t]he long-settled rule of pleading instructs that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, (1957). Counterclaim Defendants take issue with Victor's use of *Conley*, which clearly predates both *Twombly* and *Iqbal* and which Victor cites to several times throughout his Opposition. The correct standard, they note, is that a plaintiff must state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[11] This Section states in relevant part that an "Event of Dissociation" includes "the voluntary withdrawal . . . from the Company by a Member without the express written consent of a Super Majority in Interest." (Ex. A to Def.'s Mot. to Dismiss ¶ 9.1(b)(4)(C).) In turn, Paragraph 12 of the Members' Agreement provides that in the event a Member defaults "in the performance of any Member's covenants, obligations, responsibilities, duties, or undertakings" set forth in the

Article 9.2(b) states that "[t]he Members acknowledge that a dissociating Member shall have no right to a distribution on dissociation . . . ." (Def.'s Mot. to Dismiss at 18 (quoting Ex. A ¶ 9.2(b)).) Additionally, the Operating Agreement expressly provides: "[t]he General Manager has no contractual right to the General Manager's position . . . ." (*Id.* ¶ 6.2(a).)[12]

Victor has not adequately pled the elements of a breach of contract claim, namely that the actions of the other Members were not permitted under the terms of the Operating and Members' Agreements. Because Victor has not pointed to any specific provisions in the contracts he alleges have been breached, his breach of contract counterclaim is dismissed.

### iv. Count Four: Tortious Interference With Business Relationships on Behalf of InteliClear

Victor alleges that Powell, Barretto and DeVito directed the bank to close InteliClear's account without authorization and opened a new unauthorized account in New Jersey; executed a lease for Company office space in New Jersey not authorized by Victor; undermined Victor's authority as General Manager;[13] interfered with Victor's relationship with customers; caused

---

Agreements, "the non-defaulting Members may elect to treat such default as a withdrawal of the defaulting Member." (Ex. B to *id* ¶ 12.)

[12] Victor hangs his hat on the fact that he alleged the other Members "improperly denominat[ed] themselves . . . 'nondefaulting parties' under the terms of the parties' Membership Agreement . . ." (Am. Counterclaim ¶ 74.) However, the term "nondefaulting parties" is not defined in the Operating Agreement, nor in the Members' Agreement, and Victor's conclusory assertion that the other Members' actions were improper does not suffice to state a claim for breach of contract.

[13] Specifically, Victor alleges the other three Members undermined his authority as General Manager by not following his directions, excluding him from interactions with clients, and informing clients of the rift within the Company. (Am. Counterclaim ¶ 41.) Counterclaim Defendants state that "Victor does not point to any contract between InteliClear and another party with which these actions interfered. In fact, the only contracts referred to in the Amended

InteliClear to conspire with Brandon to benefit themselves, to the detriment and harm of InteliClear; filed documents with the Connecticut Secretary of State purportedly on behalf of InteliClear, reflecting their unauthorized removal of Victor as General Manager and as a Member of InteliClear; directed InteliClear's clients to send payments to addresses and accounts controlled by them; and misrepresented to clients that there has been a final determination that Victor has been dissociated from InteliClear and that he embezzled funds. (*See* Am. Counterclaim ¶¶ 38-44, 81-83.) Victor also alleges Powell, Barretto and DeVito caused InteliClear to lose an opportunity for a transaction potentially worth over twelve million dollars for the sale of the company. (*Id.* ¶¶ 18-19.)[14]

"A claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Rioux v. Barry*, 283 Conn. 338, 351 (2007). "[I]t is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two *other* parties. . . . [T]here can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract." *Metcoff*, 123 Conn. App.

Counterclaim are the governing documents of InteliClear and the only adverse impact complained of is to Victor." (Def.'s Reply at 5.) There need not necessarily be a contract in order for a claim of tortious interference with a contractual relationship–the elements also include "the existence of a contractual or beneficial relationship." *Rioux*, 283 Conn. at 351. Counterclaim Defendants appear to acknowledge this elsewhere in their briefing.

[14] Victor has not alleged that he alone had the authority to sell the company or license its product, or that the other members of InteliClear had agreed to the terms of the terms of the sale or license with which they purportedly interfered.

at 520 (emphasis in original, internal quotation marks and citations omitted). Moreover, an agent acting within his authority cannot be held liable for interfering with a contract of his principal. *See Wellington Sys., Inc.,* 49 Conn. App. at 168 ("[A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract . . . .") (internal quotation marks omitted).

Thus, Counterclaim Defendants argue, "Victor's theory that InteliClear's members have somehow interfered with InteliClear's own contracts fails to adequately allege a claim for tortious interference with business expectancies." (Def.'s Mot. to Dismiss at 18-19.)[15] Victor asserts that Counterclaim Defendants ignore that an "exception to the general rule applies if the agent did not act legitimately within his scope of duty but used the corporate power improperly for personal gain." *Metcoff,* 123 Conn. App. at 521 (internal citations and quotations omitted.) He then concludes, without pointing to any particular portion of his Counterclaim, that he has clearly alleged that Counterclaim Defendants used the corporate power improperly for personal gain, meeting this exception. However, this exception is not applicable here, because as explained by the Connecticut Supreme Court, "[a]n employee acts within the scope of his employment as long as he is discharging his duties or endeavoring to do his job, no matter how irregularly, or with what disregard of instructions." *Harp v. King,* 266 Conn. 747, 786 (2003) (internal quotation marks and citations omitted). There is no allegation that Powell, DeVito and Barretto took actions that were

---

[15] Counterclaim Defendants maintain that this Court already decided in granting the Preliminary Injunction that "Powell, Barretto, and DeVito were within their rights under the Operating Agreement and Members Agreement to dissociate Victor, and, thus, such actions were not tortious." (Def.'s Mot. to Dismiss at 19.) This is not what the Court decided; rather it determined that InteliClear had established a likelihood of success only.

outside the actual *scope* of their employment, but rather that their actions within their employment role were taken for improper purposes, which does not qualify for this exception. *See id.*[16]

Accordingly, because the Members of InteliClear cannot interfere with contracts to which they are either indirectly or directly parties, and because none of the alleged tortuously interfering acts involved "the contractual relations of two other parties," Victor's derivative claim of tortious interference with business relationships cannot survive. *See Metcoff*, 123 Conn. App. at 520.

### v. *Counts Five and Six: Direct and Derivative Fraud*

Count Five is a direct fraud claim by Victor against InteliClear, Powell, Barretto, and DeVito, and Count Six a derivative fraud claim brought by Victor on behalf of InteliClear against Powell, Barretto and DeVito. Counterclaim Defendants urge that in both instances Victor fails to allege fraud with the requisite particularity, and, as a result, fails to state a claim upon which relief can be granted.

A party alleging fraud must comply with Federal Rule of Civil Procedure 9(b), which states: "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The elements of a claim of fraud are "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to

---

[16] Counterclaim Defendants also assert that Victor's allegations are mere "internal corporate squabbles" which Victor has mistakenly equated with tortious conduct, but which in reality all concern situations in which there was no contractual or business relationship (citing Am. Counterclaim, ¶¶ 41, 42, 43, 44, 56, 81) or any adverse impact to InteliClear (citing *id.* ¶¶ 39, 40, 82, 83). (Def.'s Reply at 5.) Because the Court finds that the Members are parties to all of the contracts or beneficial relationships alleged to have been interfered with, it will not address whether the underlying actions constitute tortious conduct in the first place.

his injury." *Sturm v. Harb Dev.*, LLC, 298 Conn. 124, 142 (2010). In order to meet the requisite fraudulent intent, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *E. Point Sys I*, 133 F. Supp. 3d. at 434 (citation omitted; internal quotation marks omitted).

### 1. *Direct Fraud Claim (Count Five)*

Although Victor's Opposition purports to articulate the allegations from the Amended Counterclaims which constitute "fraudulent, improper, dishonest and unauthorized conduct" on the part of Powell, Barretto and DeVito (Pl.'s Opp'n at 20), Counterclaim Defendants correctly note that he "fails to identify the who, what, where, when, why, and how necessary to plead a claim for fraud" (Def.'s Reply at 6). Victor points to his allegations regarding the improper "Resolutions" passed by the other Members, their conduct with regard to the Company bank accounts and office space, their undermining of his relationship with customers, and improper dissociation of Victor, among others. (Am. Counterclaim ¶¶ 38-44.) Victor additionally claims that his "allegations of the counterclaim-defendants' actions after the agreements entered in the course of the Litchfield Action constitute actionable fraudulent misrepresentation." (Pl.'s Opp'n at 21.)[17]  In support thereof he cites a Connecticut appellate case for the following proposition:

> A representation about a promise to do something in the future, when linked with
> a present intention not to do it, is a false representation. Accordingly, such a

---

[17] The Counterclaim alleges that "the parties to [the Litchfield A]ction, i.e., Powell, Barretto and Victor, entered into a Stipulated Agreement . . . as an Order of the court and which included, among other things, the agreement that there would be no further interference with InteliClear's bank accounts by Powell and Barretto" and that future disputes concerning InteliClear's governance would be submitted to private dispute resolution. (Am. Counterclaim ¶¶ 68-69.) Accordingly, a scheduled hearing on Victor's application for injunction was cancelled. (*Id.* ¶ 70.)

> promise may constitute actionable fraud if it is blended with a misrepresentation of a material fact and an evasion of the very promise, after the promisee has performed.

*Duplissie v. Devino*, 96 Conn. App. 673, 681 (2006) (internal citations and quotation marks omitted.). While this may be true, it misses the point. Victor has not met the elevated pleading standard required for fraud—his allegations do not state with particularity the statement he contends are fraudulent, let alone who made such statements, where and when they were made and why they were fraudulent. *See E. Point Sys I*, 133 F. Supp. 3d. at 434. Thus, Victor's direct fraud claim fails.

### 2. *Derivative Fraud Claim (Count Six)*

Victor asserts a fraud claim derivatively on behalf of InteliClear in Count Six based upon the alleged "fraudulent and intentional misrepresentations by Powell, Barretto, and DeVito with respect to Brandon's charges paid by InteliClear." (Pl.'s Opp'n at 22 (citing ¶¶ 46-56; 85-87).) Specifically, his fraud claim alleges the false statements were with respect to "the terms under which [Brandon] would provide services to InteliClear and with respect to the actual services provided." (Am. Counterclaim, Count Six, ¶ 85(a).) Counterclaim Defendants maintain that his "factual allegations do not allege with any particularity the terms that Brandon purportedly agreed to with InteliClear, when those terms were agreed to, who at Brandon and InteliClear agreed to those terms, how Brandon did not comply with those terms, and why the terms were fraudulent." (Def.'s Reply at 7.)

The Court agrees. Like his direct claim, Victor has failed to plead his derivative fraud claim with sufficient particularity in accordance with *East Point* and therefore it is dismissed.

### vi.  *Count Seven: Breach of Fiduciary Duty*

Victor's breach of fiduciary duty claim asserts that "[t]he other members of InteliClear[] have fiduciary obligations to Victor to treat him fairly and not to apply the terms of any agreements in such a manner as to deprive him of his rights, interests and investment in InteliClear . . ." and that under the terms of the Agreements "the other members and InteliClear, acting at their direction, had the option of asserting their rights in a manner that did not work a forfeiture of Victor's entire interest in InteliClear." (Am. Counterclaim ¶85-86 at 24.) Counterclaim Defendants summarize Victor's allegations as being "that Powell, Barretto, and DeVito applied the terms of the Operating Agreement and Members Agreement in a way that was less favorable to Victor than another option," and argue he fails to "allege the nature or basis of the fiduciary duty owed by Powell, Barretto, and DeVito to him." (Def.'s Mot. to Dismiss at 21.) In response, Victor contends that where the other three Members "constitute a majority of the members of a small closely held limited liability company and have acted in concert against a member holding a minority interest" this gives rise to a fiduciary duty on the part of Counterclaim Defendants owed to Victor. (Pl.'s Opp'n at 24.)

Connecticut law defines a fiduciary relationship broadly as one "that is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Ahern v. Kappalumakkel*, 97 Conn. App. 189, 194 (2006) *see also Moore v. F.A. Inv. Holdings, Ltd.*, No. 3:10-CV-891 VLB, 2012 WL 711473, at *9 (D. Conn. Mar. 5, 2012) (an essential element to pleading a cause of action for breach of fiduciary duty is "[t]hat a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of

the defendant to act in good faith in any matter relating to the plaintiff.") Here, Victor was General Manager of the LLC and there are no allegations that the other Members had any superior knowledge, skill or expertise, giving rise to duty to represent Victor's interests.[18] *See Ahern*, 97 Conn. App. at 194.

In addition, notwithstanding any failures in the pleadings to factually support his claim of a fiduciary duty owed Victor, the law does not support Victor's claim. No appellate court in Connecticut has held that members of a limited liability company owe a fiduciary duty to one another or to the General Manager, and at least several trial courts have held that no such fiduciary duty exists. *See Kasper v. Valluzzo*, No. CV-07-5004383-S, 2011 WL 8883574, at *5 (Conn. Super. Ct. December 23, 2011) (determining member of LLC not similar to partner in partnership and holding member of LLC does not owe fiduciary duty to another member, but manager of manager-managed LLC owes fiduciary duty to LLC and its members); *Calpitano v. Rotundo*, No. CV-11-6008972-S, 2011 WL 3672092 (Conn. Super. Ct. August 3, 2011) ("…a limited liability corporation more closely resembles a business corporation than a partnership, and the members' relationship to each other is more akin to shareholders than partners," where "shareholders owe no particular duty to each other because of their status as fellow shareholders.")).

As a matter of law, Connecticut has not recognized the fiduciary duty Victor claims in Count Seven. Accordingly, his breach of fiduciary duty claim is dismissed.

---

[18] Victor characterizes the allegations in his Counterclaim as alleging "that the other members have united against him and acted in concert, and that they occupy a superior position of power and control within and over InteliClear." (Pl.'s Opp'n at 23.) Even if true, Victor provides no authority that because the other Members form a majority interest they owe him a fiduciary duty.

### vii. *Count Eight: Connecticut Unfair Trade Practices Act (CUTPA) v. Barretto*

Victor, on behalf of InteliClear, alleges in Count Eight that Barretto directed Brandon, which he controlled,[19] to engage in unfair and deceptive acts and practices in violation of CUTPA by "misrepresent[ing] the terms on which [Brandon] would provide business services to InteliClear," engaging "in unfair and deceptive billing practices" and "overcharge[ing] InteliClear for its services[,] . . . fail[ing] to maintain proper records that would enable a proper accounting and/or audit of its charges[,] and . . . conceal[ing] its practice of marking up charges and overcharges." (Am. Counterclaim ¶ 89 at 25.)

"Any person" may bring an action under CUTPA to recover actual damages suffered as the result of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a); *id* § 42-110g(a). Courts consider the criteria set out in the "cigarette rule" propounded by the Federal Trade Commission in determining whether a practice is unfair:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].

---

[19] Although Victor alleges Barretto "controlled" Brandon, he never alleges Barretto himself owned the company, and indeed indicates that Barretto told him it was his spouse's company. (*See* Am. Counterclaim ¶ 49.)

*Fink*, 238 Conn. at 215; *see also A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 215 (1990). All three criteria need not be met to support a finding of unfairness. *Hartford Electric Supply Co. v. Allen Bradley Co.*, 250 Conn. 334, 367-68 (1999).

The Counterclaim never alleges that Brandon and InteliClear entered into any specific contract or any agreement limiting Brandon's markup on the costs of its services. The factual context for Victor's CUTPA claim is that at some point while Brandon was providing services to InteliClear, Victor asked Barretto what Brandon's markup was and Barretto told him it was about three percent, but Victor doubted this figure and Barretto refused to provide documentation of the markup. (Am. Counterclaim ¶ 48-49.) Victor further alleges that Barretto did not require Brandon to maintain proper records of its activities on behalf of InteliClear.[20] (*Id.* ¶ 47.) Thus, the Counterclaim alleges "upon information and belief the actual markup is substantially higher than three percent" (*id.* ¶ 51) and that as a result of what he calls "Brandon's shoddy billing and business practices," InteliClear allegedly lost the opportunity to pass through charges to customers and collect for various projects that are beyond the normal scope of InteliClear's services (*id.* ¶ 55).

Counterclaim Defendants argue Victor has not actually alleged any misrepresentations made by Barretto or Brandon related to any agreement between InteliClear and Brandon. They urge that "[e]ven if Brandon marked up the cost of the services provided to InteliClear, such an act does not support a CUTPA claim in the absence of some affirmative statement to the contrary, which according to Counterclaim Defendants, Victor does not allege." (Def.'s Reply at 8.)

---

[20] Specifically, Victor alleges "Brandon's bills to InteliClear are vague and unclear, omitting basic information that would describe the project undertaken and the services provided in a manner that would permit reasonable verification or audit of the charges." (*Id.* ¶ 54.)

The mere fact that a vendor like Brandon marked up the costs of its services over its costs cannot without more be deemed an immoral, unethical, oppressive, or unscrupulous practice offensive to public policy, since vendors ordinarily are not in business to provide their services at cost, and the markup is frequently where the vendor makes its profit. Additionally, a business providing services for profit, presumably delimited by competitors' pricing, does not by virtue of that fact alone cause substantial injury to consumers or other businesses. Thus, there is nothing unfair or deceptive about the practice of markups. Victor's conclusory allegation that Brandon "overcharged" InteliClear does not plausibly provide the basis for a CUTPA claim because Victor makes no claim that InteliClear relied on a particular markup level from Brandon in entering into and maintaining the ongoing service relationship and offers no factual detail for his claim of "overcharging." (*See* Am. Counterclaim ¶ 89.)

Victor's allegations that Barretto represented Brandon's price as including a markup figure of only three percent—which Victor believes was actually higher—and refused to provide substantiating documentation, are similarly insufficient to provide factual plausibility for a CUTPA claim. Even if proved, they do not rise to the level of violation of any "established concept of unfairness" whether by law, public policy, or some other standard of ethics or morality. *See id.* Victor makes no claim that there exists any business practice standard requiring disclosure of costs and overall profit margins to clients, or any obligation to provide documentation of a company's proprietary financial data. Importantly, he has not alleged InteliClear, in choosing to do business with Brandon, relied upon any agreement committing Brandon to a specific markup.[21] Thus,

---

[21] The cases upon which Victor relies are not analogous to the allegations in his Amended Counterclaim for they all pertain to instances in which the parties had a specific contract which one party either unilaterally altered without right or refused to honor. *See Lester v. Resort*

Barretto's alleged misrepresentation and refusal to provide documentation of the markup does not rise to an actionable level of oppressiveness or unscrupulousness sufficient to support a CUTPA claim.

Finally, no reported court opinion appears to have addressed, let alone accepted, that allegations of "vague . . . unclear [and] shoddy billing and business practices" could alone be actionable as an unfair or deceptive practice in violation of CUTPA, and Victor provides no factual details in his Counterclaim to make plausible a resulting CUTPA claim.[22]

In sum, Victor has not plausibly alleged a CUTPA claim and therefore Count Eight is also dismissed.

---

*Camplands Intern., Inc.*, 27 Conn. App. 59, 71-72 (1992) (finding CUTPA violation where defendant "unilaterally altered" agreement without having the legal right to do so); *Empower Health, LLC v. Providence Health Solutions*, LLC, 2011 WL 2194071 at *7 (D. Conn. June 3, 2011) (Hall, J.) (allegation that defendant refused to compensate plaintiff in accordance with their agreement, requiring plaintiff "to resort to litigation to obtain relief"); *BAC Home Loans Servicing, L.P. v. Presutti*, 2010 WL 1883681, at *1, Docket No. HHD- CV-09-5029746-S (J.D. of Hartford) (Scholl, J.) (April 8, 2010) ("allegations that the Plaintiff entered into a loan mortgage modification which it refused to honor, are sufficient to support a CUTPA claim.").

[22] Counterclaim Defendants argue that merely alleging that the acts taken by Brandon were "at the direction of Barretto, as its principal" is inadequate for alleging CUTPA liability of a principal of an entity. (Def.'s Mot. to Dismiss at 24 (quoting Am. Counterclaim ¶ 89 at 25.) *See Joseph Gen. Contracting, Inc. v. Couto*, 317 Conn. 565, 588-90 (2015) ("In order to hold an individual liable, a plaintiff, after showing that an entity violated the federal act,[ ] must prove that the individual either participated directly in the entity's deceptive or unfair acts or practices, or that he or she had the authority to control them. . . . The plaintiff then must establish that the individual had knowledge of the wrongdoing at issue."). However, because the Court finds there is no underlying CUTPA claim, it does not address this argument.

### viii. Count Nine: Reformation

In Count Nine, Victor seeks to reform the Members Agreement "to comply with the law and equity" and in order to avoid an "unconscionable" result. (Am. Counterclaim, ¶¶ 85–86 at 26-27.)[23]

"Courts have the equitable authority to reform contracts in some cases to reflect the true intentions of the parties in the case of fraud or other inequitable conduct by one of the parties, mutual mistake, or to correct a scrivener's error in memorializing the agreement." *Greenwich Contracting Co. v. Bonwit Construction Co.*, 156 Conn. 123, 126 (1968). To prevail on a claim for reformation the plaintiff must establish that both parties agreed to something different from what is stated in the contract. *HSB Grp., Inc. v. SVB Underwriting, Ltd.*, 664 F. Supp. 2d 158, 176 (D. Conn. 2009). "'Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties.'" *E. Point I* at 441

---

[23] Specifically, the Amended Counterclaim states:

> The Members Agreement should be reformed to comply with the law and equity in that: (i) it purports to provide a mechanism to dissociate a member outside of the InteliClear Operating Agreement, in a manner that conflicts with the Connecticut Limited Liability Company Act; and (ii) as interpreted by InteliClear and the other members, the Members Agreement permits an inequitable and unconscionable result whereby members who have themselves engaged in repeated and extensive conduct constituting defaults of their obligations and have been notified of their defaults, may nevertheless deem themselves to be "non-defaulting members" and deem another member to be a "defaulting member" and, with no notice or opportunity to dispute or contest their actions, and for any alleged "default" that they deem sufficient, deprive the alleged "defaulting member" of all rights and interests as a member . . .

(*Id.* ¶ 85 at 26.)

(quoting *Lopinto v. Haines*, 185 Conn. 527, 532 (1981)). "'It is well established that reformation is appropriate only to conform an agreement to accurately reflect the intentions of the parties at the time of the agreement. . . . It is not what the parties would have intended if they had known better, but what they did intend at the time, informed as they were.'" *Coles v. J & K Ass'n*, No. CV9970829S, 2001 WL 358847 (Conn. Super. Ct. Mar. 27, 2001) (quoting *Beecher v. Able*, 575 F.2d 1010, 1015 (C.A.2 1978)).

Counterclaim Defendants maintain that Victor's conclusory allegation that the contract terms are the "result of either mutual mistake or inequitable conduct on the part of the defendants" (Am. Counterclaim, Count Nine, ¶ 86), without any alleged facts supporting this conclusion, does not support a claim for reformation. (Def.'s Mot. to Dismiss at 26-27.) They further claim that Victor's argument mistakenly focuses on how the terms of the Agreements were applied in 2016, rather than the intention of the parties at the time the contract was formed as required. (Def.'s Reply at 9.)[24]

Counterclaim Defendants are correct. Victor has not alleged facts plausibly supporting that he, Powell, DeVito, and Barretto agreed to something different from the terms stated in the contract. Nor has he alleged specific facts supporting any claim of "inequitable conduct" by Counterclaim Defendants at the time the agreement was made. Indeed, Victor's Counterclaim

---

[24] Victor argues that the "rights of the parties depend upon the interpretation of ambiguous terms in the Members Agreements relating to 'defaulting' and 'non-defaulting' parties and the remedies for 'defaults,' [which t]he other Members seized upon . . . to effect a draconian remedy." (Pl.'s Opp'n at 26-27.) Accordingly, he concludes "[w]hether this provision was intended to apply in the manner in which it has been invoked by Powell, Barretto and Devito and whether they have acted inequitably constitutes, at a minimum, a question of [f]act." (*Id.* at 27.) Victor ignores that at the motion to dismiss phase the question is whether he has plausibly alleged facts that support his claim.

omits reference to the parties' intent at the time of the formation of the contract and therefore he cannot have possibly alleged how the contract inadequately memorialized that intent. Thus, Victor's claim for reformation must be dismissed.

### III.  CONCLUSION[25]

For the foregoing reasons, Counterclaim Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. The Motion is denied with respect to Count One (Injunction against all Counterclaim Defendants) but granted on all other Counts.

IT IS SO ORDERED.

        /s/                              
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 1st day of September 2017.

---

[25] Victor asserts that he should be able to amend his pleading if necessary, ignoring the Court's prefiling conference instruction. Counterclaim Defendants articulated the deficiencies in Victor's Counterclaim and the Court warned Victor's counsel that if he did not cure the deficiencies the Counterclaim or any amended counterclaim may be dismissed with prejudice. Victor will not be given leave to again amend his Counterclaim.